IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHRISTINE CLAPP,
     Plaintiff,

vs.                               Case No. 3:06cv334/MCR/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB).

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of the Social Security Administration.  Therefore, he is automatically substituted as Defendant.  *See* Fed. R. Civ. P. 25(d)(1).

I.      PROCEDURAL HISTORY

        This suit involves an application for DIB under Title II of the Act, 42 U.S.C. §§ 401–34 (Tr.

84–86).[2]  Plaintiff's application was denied initially (Tr. 55, 57–60) and on reconsideration (Tr. 56,

63–65).  On March 22, 2006, following a hearing, an administrative law judge (ALJ) rendered a

decision in which he found that Plaintiff was not under a "disability" as defined in the Act at any

time through the date of his decision (Tr. 14–38).  On June 5, 2006, the Appeals Council of the

Social Security Administration denied Plaintiff's request for review (Tr. 6–8).  Thus, the decision

of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge

v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

        On March 22, 2006, the ALJ made several findings relative to the issues raised in this appeal

(Tr. 17–38):

        1)      Plaintiff meets the Act's insured status requirements through December 31, 2007.[3]

        2)      Although Plaintiff worked during the time relevant to the ALJ's decision, she  has
                not engaged in "substantial gainful activity" (SGA) during that time (20 C.F.R.
                § 404.1520(b)).

        3)      Plaintiff has the following severe impairments: major depressive disorder, post-
                traumatic stress disorder (PTSD), anxiety disorder, and cervical and lumbar
                sprain/strain (20 C.F.R. § 404.1520(c)).

        4)      Plaintiff's alleged endometriosis, irritable bowel syndrome, migraine headaches, and
                personality disorder are impairments that do not entail significant work-related
                limitations of record for a continuous twelve-month period during the period of
                adjudication.  The medical evidence has not suggested significant work-related
                limitations arising therefrom, and no treating physician has placed work restrictions
                on Plaintiff because of these conditions; therefore, these alleged impairments are
                "non-severe."

---

        [2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on January 24,
2007 (Doc.13).

        [3]Thus, the time frame relevant to this appeal is November 1, 2003 (amended alleged onset (see Tr. 521)) to
March 22, 2006 (date of ALJ's decision).

5)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

6)      Plaintiff has the residual functional capacity (RFC) to perform work activities at the sedentary exertional level with no climbing, balancing, or crawling; occasional stooping, kneeling, crouching, pushing, and pulling; and mild limitations in maintaining social functioning and maintaining concentration, persistence and pace.

7)      Plaintiff is capable of performing her past relevant work as a taxicab starter, insurance clerk, legal secretary, and receptionist.  This work does not require the performance of work-related activities precluded by Plaintiff's RFC (20 C.F.R. § 404.1565).

8)      Plaintiff was not under a "disability," as defined in the Act, from November 1, 2003 through March 22, 2006, the date of the ALJ's decision (20 C.F.R. § 404.1520(f)).

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L.

Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any SGA by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, she is not disabled.

2.      If the claimant is not performing SGA, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing SGA and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform. <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

     A.    Personal/Employment History

Plaintiff was born in 1970, and she completed high school and two years of college (Tr. 84, 513).  She has previous work experience as a paralegal, transcriptionist, legal secretary, receptionist, salesperson, and with a temporary placement service (Tr. 116).  She was in two motor vehicle accidents (MVA's), one in 1997 and the other in 2002 (Tr. 499).  She began seeing a pain management physician and a chiropractor after the second accident (*id.*).  Plaintiff testified that she has back pain, and as a result she cannot stand for any length of time or sit longer than ten to fifteen minutes (Tr. 503–04).  She also noted that her medications make her lethargic during the day, at times she has blackouts, and she takes naps every day for two to three hours (Tr. 500–01).  At the time of her hearing in May 2005 she was working approximately 25 to 30 hours per week for Pensacola Bay Transportation (PBT) as a reservationist, and she had been employed there since approximately October 2004 (Tr. 492).  Plaintiff testified that she could not work full time at PBT because she suffered from migraine headaches, but her supervisor accommodated her by allowing her to take breaks and miss two to three days of work per month (Tr. 495–97).  Plaintiff noted that she had migraines at least once or twice a week and that they typically lasted two to three days (Tr. 497).  Prior to the PBT job, Plaintiff worked for "CHCS" assembling insurance polices and preparing them for mailing (Tr. 493).  It appears that Plaintiff worked at CHCS from April through June of 2004, and although Plaintiff testified that she worked thirty-two (32) hours per week, she described the job as a "full-time job" (*id.*).  In June 2004 Plaintiff was hospitalized after attempting suicide by overdosing on Lortab and Flexeril (Tr. 404).  She reported that she was under stress and had been getting "drunk half of the days" during the last six months (*id.*).

When Plaintiff first applied for benefits, she alleged that she became disabled on April 9, 2002, but she amended her onset date to November 1, 2003 at her hearing (Tr. 84, 521).  She has alleged disability due to neck and back injuries, depression, and anxiety (Tr. 115, 132). Plaintiff

acknowledged that she was receiving unemployment benefits (UB) in May 2003, and that in order to receive those benefits she had to certify that she was "ready, able, and willing to work" (Tr. 334, 505). However, Plaintiff maintained during her hearing that she was unable to work full-time when she applied for UB (Tr. 506). Plaintiff noted that she received UB for approximately one year and that the benefits ceased in October 2003 (Tr. 505, 521). Because Plaintiff previously certified that she was able to work through October 2003 for UB purposes, she amended her onset of disability date for DIB purposes to November 2003 (*see* Tr. 521).

  B.  Relevant Medical History — Physical[4]

  Plaintiff was treated in the emergency room at West Florida Hospital on February 3, 2002, following an MVA in which she was rear-ended, and which caused her to hit the car in front of her. Plaintiff rated her pain at "7" on a ten-point scale. Plaintiff reported that she had a history of back and neck pain secondary to a previous MVA for which she took Skelaxin. On examination, Plaintiff was tender over the paracervical spine with early, mild muscle spasm. She had essentially full range of motion of the cervical spine, and her thoracic spine was normal. She had diffuse mild tenderness over the lumbar spine but no sciatic notch tenderness. Motor and sensory examinations were normal, as were x-rays of the cervical and lumbar spine. Plaintiff was diagnosed with acute lumbosacral and cervical strain, and she was treated with oral Diazepam, Percocet, and Motrin with good relief. She was discharged and instructed to use an ice pack on the affected areas for 72 hours (Tr. 170–74).

  Plaintiff began chiropractic treatment with Philip E. Renfroe on February 8, 2002, and the records in the file reflect treatment through approximately March 24, 2003 (*see* Tr. 190–263). At the conclusion of Dr. Renfroe's treatment, he wrote a letter titled "Final Narrative" to an attorney's office describing his treatment of Plaintiff as follows (*see* Tr. 264–66). Upon initial presentation, Plaintiff complained of cervical pain across the top of both shoulders, low back pain bilaterally, and mid-back pain. She rated her pain at "8" but advised that it varied in intensity. She described her

---

[4]The court notes that the record contains evidence of Plaintiff's mental impairments, but Plaintiff has raised no issue in the instant appeal regarding the ALJ's consideration of her mental impairments. Thus, the summary of Plaintiff's medical history does not include any evidence regarding Plaintiff's mental impairments unless relevant to the issues in this case. The court further notes that unless otherwise indicated the medical summary in this Report and Recommendation is derived from the summary provided by the ALJ in his decision.

pain as a dull, aching discomfort in her neck and low back with stiffness in both.  She reported sharp
pains on active movement of the cervical and lumbar spine, and she noted that activities such as
excessive standing and bending were difficult.  On initial examination, Plaintiff's dorsolumbar range
of motion was limited in extension, but other range of motion was fairly normal.   Seated
examination revealed that her cervical range of motion was limited in extension and flexion.  The
foramina compression test was positive, the vertibrobasilar maneuver was negative bilaterally, and
the Jacksonian compression test was positive bilaterally. With Plaintiff lying supine, straight leg
raising tests were negative bilaterally.  Spinal palpation revealed articular dyskinesia most notably
at C4 and C5, as well as at L5, with edema and increased elicited pain over the facets bilaterally at
those levels.  Muscle palpation revealed spasm and tenderness in the cervical erectors bilaterally.
Some spasm, tenderness, and trigger points in the trapezius muscle bilaterally, worse on the left,
were present.  Spasm and tenderness were also present in the lumbar erectors bilaterally and in the
left sternocleidomastiodius muscle.  Dr. Renfroe reviewed spinal x-rays from West Florida Hospital
which were reported as normal.  Dr. Renfroe obtained cervical flexion/extension views that day to
further evaluate the ligamentous integrity of the cervical spine.  These x-rays revealed a slight
extension/malposition at C5–6 and slight anterolisthesis at C4–5 with flexion deformity.  A cervical
magnetic resonance image (MRI) completed on May 3, 2002, revealed no evidence of post-traumatic
disc herniation, misalignment, or canal or foraminal stenosis.  Plaintiff was diagnosed with cervical
and lumbar sprain/strain with associated cervicalgia and lumbalgia, exacerbating pre-existing
cervical and lumbar injuries.   She was treated with therapy modalities including electrical
stimulation, moist heat packs, and spinal manipulation to the cervical and lumbar spines, as well as
myofascial release beginning February 8, 2002 and continuing until August 1, 2002.  In August 2002
Dr. Renfroe felt that Plaintiff had reached maximum medical improvement (MMI) with regard to
chiropractic intervention, and she was placed on a "return-as-needed" basis.

Dr. Renfroe noted that Plaintiff had improved with conservative interventions and had not
shown any progressive degenerative changes on imaging, even given her past neck and lower back
injuries. He predicted that Plaintiff might need supportive-type care during periods of exacerbation,
both in the form of chiropractic care and medical care through pain management, but no more than

ten to twelve office visits per year.  Dr. Renfroe placed no functional limitations on Plaintiff in her line of employment (i.e., secretarial-type work).

On May 9, 2002, Plaintiff began treatment with Kurt A. Krueger, M.D., a pain management specialist (Tr. 188; *see also* Tr. 421).  On her initial visit, and again on May 23, 2002, Dr. Krueger performed placement of selective cervical epidural medications under fluoroscopy to treat Plaintiff's pain (Tr. 186, 188).

In a letter to an attorney's office dated September 23, 2002, Dr. Krueger opined that Plaintiff had sustained a permanent injury secondary to her MVA of February 3, 2002 (Tr. 176).  He assigned her a permanent impairment rating of "3% impairment to the whole person" related to that injury (*id.*).  He stated that he had placed her at MMI on September 1, 2002, from a pain medicine point of care (*id.*).  Dr. Krueger further stated that he was aware of Plaintiff's previous injuries, but he indicated that she had regained a stable activity level prior to the more recent accident, and therefore, the impairment rating was "per her accident of [February 3, 2002] only" (*id.*).  Dr. Krueger reported that Plaintiff would need to limit repetitive motions of the upper extremities, as well as being in a fixed posture, such as sitting in front of a computer for any length of time, which he estimated she could do for no more than one hour before needing a break from that position (*id.*).  He stated that he did not consider Plaintiff to be a candidate for a surgical procedure related to injuries from the February 3, 2002 accident, but her future care should focus on further "physical therapy and chiropractic modalities" (*id.*).  He advised that this would entail two sessions of physical therapy per year, at eight visits per session, or chiropractic care of the same duration (Tr. 176–77).  Dr. Krueger reported that oral medications would be necessary for the "foreseeable future," noting that Plaintiff was presently on Lortab and Flexeril (Tr. 177).  He opined that Plaintiff was temporarily disabled from the accident from February 3, 2002 through July 9, 2002, but that since July 9, she was at a "sedentary work load level, tolerable for a part-time duration of four hours per day" (*id.*).

Plaintiff sought treatment from Dr. Richard Wayne on January 27, 2003.  In addition to her back and neck injuries, she complained of PTSD as a result of her accident and advised that she was under the care of a psychiatrist/psychologist.  She reported that she had received two cervical epidural steroid injections and one trigger point injection.  Plaintiff continued to complain of headaches and neck pain and rated her pain as "6–7" most of the time.  Her pain was said to be

exacerbated by twisting or bending and relieved by applying heat and taking medications.  Dr. Wayne observed no overt pain behaviors.  Examination of Plaintiff's cervical spine revealed a somewhat limited range of motion at the extremes.  She had approximately 25–30% of normal range of motion in flexion, extension, and rotation.  Examination of her lumbar spine revealed positive myofascial pain, which was concordant with her pain complaints, as well as positive facet pain to provocative testing at approximately L4–5, which was also concordant with her pain complaints.  Dr. Wayne's diagnostic assessment included multiple injuries post MVA with cervicalgia, myofascial pain, and depression.  He suggested a functional capacity evaluation (FCE) and stated that Plaintiff might be a good candidate for facet joint injections for diagnostic and therapeutic purposes.  He renewed Plaintiff's prescriptions (Tr. 179).

On February 25, March 4, and March 11, 2003, Dr. Ruben Timmons (a partner of Dr. Krueger (*see* Tr. 176)) performed bilateral facet injections at L3–4, L4–5, and L5–S1.  Plaintiff returned to Dr. Timmons on April 8, 2003, complaining of low back pain.  She advised that she was doing well until she strained her back the week before.  Dr. Timmons noted limited range of motion in Plaintiff's head, neck, back, and extremities.  His diagnostic impression was facet arthropathy and low back pain.  Dr. Timmons continued conservative management, but he indicated that because Plaintiff had experienced relief from facet injections, she would respond to facet rhizotomy, for which he referred her to Dr. Craig Cartia (Tr. 180–89, 268).

Plaintiff underwent a consultative physical examination by Dr. Richard W. Lucey on June 11, 2003 (Tr. 269–72).  Plaintiff reported the history of her MVA and advised that she had been treated by pain management consultants, had epidural blocks to her neck and low back, and had trigger point injections and facet blocks in her low back.  She indicated that she had a good response to her neck injections and that her neck pain had resolved but that she continued to experience chronic pain in her low back.  She described the pain as paralumbar, non-radiating, and constant, and she advised that it was aggravated by bending, stooping, and lifting, but was present most or all of the time.  Plaintiff reported that she also had problems with depression. She stated that there had been several MVA's, and as a result of her injuries, she had begun experiencing emotional stress and depression.  She advised that despite psychiatric care and the use of medication, she still had good days and bad days regarding her depression, although she thought that she had some overall

improvement with medication.  Plaintiff reported that a laparoscopy had revealed endometriosis and she had been diagnosed with irritable bowel syndrome by colonoscopy.  She listed her medications as Prozac, Klonopin, Flexeril, Traxodone, Fioricet, and Lortab.  On examination, Plaintiff had full range of motion in her neck.  Her grip strength was 5/5.  She had full range of motion of all upper and lower extremity joints.  She demonstrated normal fine manipulatory movements, and she had no weakness, atrophy, sensory deficits, or joint deformities.  Dr. Lucey noted normal deep tendon reflexes.  Plaintiff had no edema or varicosities in her lower extremities.  Supine straight leg raises were negative to 80 degrees, and there was no effusion, crepitus, laxity or joint deformity.  Plaintiff's gait was normal, and heel, toe, and tandem walking were without evidence of weakness or ataxia.  Dr. Lucey observed that Plaintiff transferred easily from supine to sitting.  He noted that the range of motion of the thoracolumbar spine was somewhat diminished, primarily with lateral bending, due to subjective discomfort.  Dr. Lucey described Plaintiff as alert, pleasant, cooperative, and well-groomed, without overt mood or thought disturbances.  His diagnostic assessment was history of chronic depression; history of hyper-extension injury with myofascial cervical strain, resolved; and history of chronic myofascial low back pain and apparent lumbar facet arthropathy (*id.*).

Plaintiff returned to Dr. Krueger on August 27, 2003 (Tr. 397).  She continued to complain of low back and neck pain with the back pain being worse, and she rated her pain at "7–8."  Plaintiff advised that she was taking a half to one Lortab per day which had been helpful in managing her pain, but she requested a higher dosage.  On examination, Dr. Krueger noted that the range of motion of Plaintiff's back revealed 90 degrees of flexion, and hyper-extension to about 10 degrees.  Palpation revealed tenderness along the facet joints bilaterally.  Muscle strength was 5/5 in all muscle groups, equally and bilaterally in the upper and lower extremities.  Sensation was symmetrical and intact to light touch and pinprick, and equal and bilateral to the upper and lower extremities.  Motor stretch reflexes were 2/4 equally and bilaterally to the upper and lower extremities.  Dr. Krueger's diagnostic impression was low back pain, lumbar facet syndrome, and myofascial pain syndrome.  He increased the dosage of Plaintiff's Lortab (Tr. 397–98).  On October 28, 2003, Dr. Krueger reported that he had initiated a Methadone trial a month before and that Plaintiff had found it quite helpful, especially in combination with other medications.  Plaintiff

advised that pain continued to radiate across her low back primarily and intermittently down into her left lower extremity.  When she told Dr. Krueger that she had been looking for work, he indicated that it would be to her benefit, both psychologically and physically, to have some type of employment.  He suggested a sedentary position at four hours per day to work up to a full-time position.  Dr. Krueger observed that Plaintiff's memory was intact and that she had normal attention span and concentration.  Examination of Plaintiff's low back and lower extremities revealed overall guarding with range of motion at flexion at 70 degrees and extension at 5–10 degrees.  Palpation revealed generalized pain over the bilateral paraspinous musculature and the bilateral lower facet joint complexes.  Dr. Krueger continued Plaintiff on Methadone twice a day and Lortab for breakthrough pain, and he started her on Baclofen (Tr. 395–96).  On December 29, 2003, Plaintiff returned to Dr. Krueger, complaining of pain in her lower neck with radiation into her shoulders as well as mild spasms in her back with associated pain.  She denied radiation into either lower extremity.  Examination of Plaintiff's head, neck, and upper extremities revealed mild overall guarding.  Dr. Krueger noted that Plaintiff transitioned with some difficulty and had a reduced range of motion by 30–40% in all directions.  Palpation over the lowermost cervical region produced pain as well as some tenderness over the bilateral levator scapulae.  Palpation of the lower back produced moderate paraspinous spasm, but no trigger points were elicited.  Dr. Krueger continued Plaintiff's medications and gave her samples of Celebrex and Ultracet (Tr. 393–94).  Plaintiff returned on February 25, 2004.  She reported that her medication was "manag[ing] her pain overall" (Tr. 391). The results of Plaintiff's physical examination were similar to those from her previous visit (*see* Tr. 391–92).  Plaintiff returned to Dr. Krueger on March 18, 2004, for a reevaluation, and management and monitoring of her medications (Tr. 389).  She complained of intermittent burning of the lower extremities when walking, and she rated her pain at an "8" (*id.*).  Physical examination revealed "minimal limitation with flexion and hyper-extension" on range of motion of her back, and moderate tenderness across her lower lumbar region (*id.*).  Dr. Krueger's most recent record reflects that he examined Plaintiff again on April 21, 2004 (Tr. 387).  She advised that the Methadone and Lortab seemed to be managing her pain, although she rated her pain at an "8."  Dr. Krueger observed that Plaintiff's memory was intact, and she had normal attention span and concentration.  On examination, Plaintiff had only minimal limitations on flexion and hyper-extension of her lower

back.  Dr. Krueger reported that Plaintiff seemed to have no appreciable spasm, trigger points, or tenderness in her back or neck.  Finally, Dr. Krueger noted that Plaintiff had 5/5 muscle strength in all muscle groups equally and bilaterally in the upper and lower extremities.  Plaintiff's medications were renewed (Tr. 387–88).

On April 29, 2004, Dr. Krueger completed a "Clinical Assessment of Pain Form," in which he selected answers on a preprinted form indicating that Plaintiff's pain was present to such an extent as to be distracting to the adequate performance of daily activities or work.  He reported that physical activity would cause an increase in pain to such a degree as to cause distraction from task or total abandonment of task.  Medication was said to cause some limitations but not to such a degree as to create a serious problem in most instances.  Finally, Dr. Krueger opined that Plaintiff had an underlying medication condition that was consistent with the pain she experienced (Tr. 401–02).

Plaintiff sought treatment for a migraine headache at Escambia Community Clinic on December 29, 2004.  She reported that she had the headache for two days and described it as a throbbing sensation behind her eyes, worsened by light.  She was given an injection of Nubain and Phenergan.  She returned on February 7, 2005, complaining of pelvic pain from endometriosis.  She was prescribed Lortab and Naproxen (Tr. 450–52).

Plaintiff underwent a consultative orthopedic examination by Dr. C.W. Koulisis on January 12, 2005.  Plaintiff reported the history of her 2002 MVA and complained of neck pain and back pain with non-dermatomal radiation into her left upper extremity.  She advised that she had three cervical epidurals and one lumbar epidural, and that the cervical epidurals helped but the lumbar epidural did not.  She indicated that she was maintained on Robaxin, Naproxen, Lexapro, Trazodone, Flexeril, and Phenergan.  Dr. Koulisis observed that Plaintiff arose without difficulty and upon standing had normal cervical lordosis, thoracic kyphosis, and lumbar lordosis.  He also noted that Plaintiff had a normal gait and was able to heel, toe, and tandem walk without difficulty.  Plaintiff had full range of motion in all joints except for a very slight decrease in flexion of her knees.  X-rays of the cervical spine and lumbar spine revealed no acute bony abnormalities.  Dr. Koulisis' diagnostic impression was chronic neck and low back pain complaints.  On January 12, 2005, Dr. Koulisis completed a "Medical Assessment of the Ability to do Work-Related Activities,"

in which he indicated no limitations in any area as related to Plaintiff's orthopedic conditions (Tr. 432–41).

On February 14, 2005, Dr. Krueger completed several forms.  First, he completed a "Sedentary Requirements Checklist," in which he found that Plaintiff could use both hands in fine manipulation, lift five pounds on a repetitive basis, "infrequently" lift and carry ten pounds, and walk short distances (Tr. 464).  He further found that Plaintiff could not "sustain activity at a pace and with the attention to task as would be required in the competitive workplace," nor could she sit up to six hours in a normal position, stand up to two hours in an eight-hour workday, or "attend to any employment on an eight-hour/five days a week basis" (*id.*).  Finally, Dr. Krueger answered "no" to a question that asked whether Plaintiff has a "non-exertional impairment which has a neurological, psychological, allergenic, respiratory or environmental restriction associated with it or in which pain, fatigue or intelligence substantially restrict [her] ability to function" (*id.*).  Second, Dr. Krueger completed a "Medical Assessment of Ability to Do Work-related Activities," in which he indicated that Plaintiff could lift and carry five pounds frequently and ten pounds occasionally (Tr. 465).  He opined that in an eight-hour workday, Plaintiff could stand or walk for a total of two hours in half-hour intervals, and sit for a total four hours in half-hour intervals (Tr. 465–66).  Dr. Krueger reported that Plaintiff should never climb, balance, or crawl, but she could occasionally stoop, kneel, or crouch (Tr. 466).  He indicated that frequent pushing or pulling would increase Plaintiff's low back pain, but he found that Plaintiff's ability to reach, handle, feel, see, hear, and speak was not affected by her impairment (*id.*).  Finally, Dr. Krueger noted no environmental restrictions (*id.*).  Third, another "Clinical Assessment of Pain" form was completed (Tr. 467).  Dr. Krueger's answers on this form were the same as those on the form he completed on April 29, 2004, as described, *supra* (*compare* Tr. 401–02 *with* Tr. 467–68).  Finally, Dr. Krueger completed a fourth form titled "Absences from Work," on which Dr. Krueger estimated that Plaintiff would be absent from work about three times per month as a result of her impairments or treatment (Tr. 469).

Records from the Escambia Community Clinic dated April 21, 2005 indicate that Plaintiff had decreased range of motion in her spine.  Flexion and extension were restricted and painful.  She was prescribed Hydrocodone-Acetaminophen and Baclofen (Tr. 483–87).  It was noted in the clinic

records that Plaintiff was previously a patient of Dr. Krueger, but she had not seen him for approximately one year (Tr. 483).

On April 21, 2005, Plaintiff sought chiropractic care from Dr. David A. Edge (Tr. 488). Plaintiff reported an entrapment headache and sought some palliative results along the dorsal and cervical spine. She was treated with mobilization, manipulation, axial distraction, physiotherapy, heat, stretching, and massage. She returned on April 26, 2005 and reported improvement in her lower back pain and flexibility but no change in her occipital headache. Dr. Edge reapplied C1, C2, and L5 manipulation (*id.*).

C.       Other Information Within Plaintiff's Claim File

The file contains two "Physical [RFC] Assessments" completed by agency physicians on July 2, 2003 and October 20, 2003 (Tr. 292–307). The first physician concluded that Plaintiff could occasionally lift or carry (including upward pulling) fifty pounds; frequently lift or carry (including upward pulling) twenty-five pounds; and stand, walk, or sit (with normal breaks) for about six hours in an eight-hour workday. Further, Plaintiff had the unlimited ability, subject to the aforementioned restrictions, to push or pull (including operation of hand or foot controls). Plaintiff had no postural limitations (i.e., in her ability to climb, balance, stoop, kneel, crouch or crawl) or any visual, communicative, environmental, or manipulative limitations (i.e., in her ability to reach, handle, finger, or feel) (Tr. 292–99). The second physician reached similar conclusions, except she noted that Plaintiff would have frequent postural limitations due to her low back pain (*see* Tr. 301–04).

Finally, a vocational expert (VE) testified at Plaintiff's hearing before the ALJ. She was asked to consider for all questions an individual of Plaintiff's age, with Plaintiff's educational background and work history (Tr. 513–14). Next, the VE was asked to consider that the individual had the limitations (or lack thereof) described in Exhibits 15F and 16F, which are the RFC assessments completed by two agency physicians (Tr. 514). In response, the VE indicated that Plaintiff could return to her past relevant work (*id.*). The VE also indicated that Plaintiff could return to her past relevant work if the restrictions contained in Exhibit 27F, Dr. Koulisis' report, were fully accepted (Tr. 515). However, if the restrictions imposed by Dr. Krueger in Exhibit 6F (i.e., Tr. 176–77) were fully accepted, Plaintiff could not return to her past work because her prior work required frequent reaching, handling, and fingering, or "lengthy, repetitive use of her upper

extremities," and Dr. Krueger specifically stated that Plaintiff would have to "limit any of the repetitive motions of the upper extremities, as well as, being in a fixed posture such as sitting in front of a computer for any length of time," such as an hour, before needing a break (Tr. 176, 515). The VE stated "when you take a break every hour, it would also, in all likelihood, preclude her past relevant work" (Tr. 516).  Nevertheless, the VE opined that there would be other jobs that Plaintiff could perform, although she would be extremely limited, given that jobs requiring repetitive upper extremity use would have to be eliminated (*id.*).  Plaintiff could work as a school bus monitor with 156,000 such jobs available nationally and 11,000 in Florida, and an office helper, with 141,000 such jobs nationally and 6,300 in Florida  (*id.*).  If the upper extremity restriction was lifted, however, there would be 2,000,000 jobs nationally and approximately 180,000 in Florida that Plaintiff could perform (*see* Tr. 517).  Finally, if Dr. Krueger's opinions on the Clinical Assessment of Pain questionnaire (*see, e.g.*, Tr. 401–02), the Physical Capacities Evaluation (Tr. 465–66), or the Absences from Work questionnaire were fully accepted, Plaintiff would be unable to work at any job (Tr. 518).  Although the remaining testimony of the VE is not perfectly clear, she appears to have opined that considering every restriction indicated by Dr. Krueger, Plaintiff may be capable of, "at best," performing sedentary work on a part-time basis (Tr. 519).  She also indicated that missing more than one day of work per month would likely preclude employment, as most workers are given approximately ten sick days per year (Tr. 520).

V.    DISCUSSION

Plaintiff raises three issues on appeal.  First, Plaintiff contends the ALJ erred in failing to give proper weight to the opinions of Dr. Krueger, a treating physician, and additionally erred in accepting the opinions of non-examining physicians over those of Dr. Krueger.  Next, Plaintiff asserts that the ALJ erred in determining her RFC.  Finally, Plaintiff contends that the ALJ erred in his consideration of the VE's testimony (*see* Doc. 17 at 11–16).[5]  Plaintiff's second and third grounds, however, are related to the first ground, as she asserts that the RFC should have been based upon the opinions of Dr. Krueger, and the VE's answers to questions containing the restrictions

---

[5]Plaintiff appears to have filed two identical memoranda in support of her complaint (*see* Docs. 15, 17).  The court will rely upon the more recently filed memorandum (Doc. 17).

imposed by Dr. Krueger should have been accepted by the ALJ and would have compelled a finding that Plaintiff was disabled. Thus, Plaintiff's arguments will be addressed together.

A.     Weighing Medical Opinions

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a

physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record. SSR 96-5p.  In <u>Lewis</u>, 125 F.3d at 1441, the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly

considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

The issues in the instant case concern the ALJ's consideration of the opinions of Dr. Krueger, a treating physician (*see* Doc. 17 at 11–15).  Plaintiff asserts that although the ALJ stated he gave "significant weight" to Dr. Krueger's opinion, he went on to improperly reject most of his opinions on the basis that they were "internally inconsistent" (*id.* at 12).

A review of the ALJ's opinion reveals that he declined to give "controlling weight" to the opinions of Dr. Krueger for several reasons.  Initially, the ALJ noted that "the record reflects work activity after the alleged onset date" (Tr. 18).  This was a proper factor for the ALJ to consider.  *See* Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) ("it was also not unreasonable for the ALJ to note that Harris's . . . part-time work [was] inconsistent with her claim of disabling pain").  Additionally, the ALJ noted that when Plaintiff informed Dr. Krueger that she was looking for work, he told her that "it would be to her benefit, both psychologically and physically, to have some type of employment" (Tr. 34, 395).  Dr. Krueger suggested that Plaintiff begin in a sedentary position for four hours per day and "work up to a full time position" (Tr. 395).  Moreover, in November 2004, Plaintiff reported that her job was going well (Tr. 455), and as noted by the ALJ, in February 2005, Plaintiff's project manager at PBT described her as a hardworking and valued employee, who was well liked by her fellow employees and the public (Tr. 34, 107).  At the time of the hearing, Plaintiff was working 25 to 30 hours per week, and she previously worked "full-time" (i.e., thirty-two (32) hours per week) during the period under adjudication (*see* Tr. 493).  Although Plaintiff contends she could not work full time and her current employer made accommodations for her, her employment

was nevertheless properly considered by the ALJ, as work performed during any period in which Plaintiff alleges that she was under a disability may demonstrate an ability to perform SGA. *See* 20 C.F.R. § 404.1571 (2006); Harris, 356 F.3d at 930.

Next, the ALJ noted that Plaintiff's treatment was "generally successful" in controlling her symptoms (Tr. 34). For example, the ALJ noted Plaintiff's successful chiropractic treatment with Dr. Renfroe, who, in August 2002, indicated that Plaintiff had reached MMI, and he placed her on a "return-as-needed" basis (*id.*). Similarly, the ALJ referenced Plaintiff's report to Dr. Krueger that her medications seemed to be managing her pain (Tr. 34, 387). "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted). The ALJ also noted that Plaintiff improved with conservative treatment. *See* Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (an ALJ may properly consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony), and Dr. Krueger recommended only conservative care (*see, e.g.*, Tr. 176–77), as did Dr. Wayne (to the extent that he, like the others, did not recommend surgery) (*see, e.g.*, Tr. 179) and Dr. Renfroe. Furthermore, the ALJ observed that Dr. Renfroe placed no functional limitations on Plaintiff in her line of secretarial-type work (Tr. 34).

Next, the ALJ noted Plaintiff's inconsistent statements regarding her ability to work. In particular, the ALJ noted that Plaintiff certified that she was ready, willing, and able to work full time when she applied for UB, but she claimed under oath in her application for DIB regarding the same time frame that she was unable to work (Tr. 35; *see also* Tr. 84–86). Thus, the ALJ concluded that "this clearly shows a prevarication to either the State of Florida or to the Social Security Administration," noting further that in either event, "it establishes the claimant as an individual not likely to give honest and forthright information in a claim for monetary benefits" (Tr. 35). *See* 20 C.F.R. § 404.1529(c)(4) (ALJ may consider inconsistencies in the evidence and conflicts in a claimant's statements in evaluating symptoms, including pain). Moreover, although not mentioned by the ALJ, it is significant that Plaintiff's psychiatrist indicated that she "appear[ed] to be quite drug-seeking" and was angry that he could not give her the medication she requested (Tr. 456). *See* Frey v. Bowen, 816 F.2d 508, 516 (10th Cir. 1987) (citing Byron v. Heckler, 742 F.2d 1232, 1235

(10th Cir. 1984) (subjective complaints must be evaluated with due consideration for credibility, motivation, and medical evidence).

Further, the ALJ discussed Dr. Krueger's records, noting that when Plaintiff was examined by Dr. Krueger during the relevant time frame, she "had only minimal limitations on flexion and hyper-extension of her lower back and Dr. Krueger reported that she seemed to have no appreciable spasm, trigger points, or tenderness in her back or neck" (Tr. 34). Indeed Dr. Krueger's records repeatedly show that Plaintiff's motor strength was 5/5 in all of her muscle groups (Tr. 387, 433; *see also* 452, 485 (Escambia Community Clinic records)), and her gait and station were normal (Tr. 389, 391, 433, 452, 484, 486). Plaintiff was also noted to have no gross neurological deficits (Tr. 409, 443, 452, 485), and she had no edema in her extremities (Tr. 445, 473). In December 2003 and February 2004, Dr. Krueger noted that Plaintiff had reduced range of motion by more than 30 percent in all directions and moderate spasm; by April 2004, however, he indicated that Plaintiff had only minimal limitations with the range of motion of her back with no appreciable spasm, trigger points, or tenderness (Tr. 387, 391, 393). Also on her final examination by Dr. Krueger in April 2004, Plaintiff had nearly full range of motion in her neck in all directions and no appreciable spasm or triggers (Tr. 387). In addition, her sensation was intact in both her upper and lower extremities (Tr. 388). Accordingly, the ALJ concluded that Plaintiff was not as limited as Dr. Krueger later described, when he was asked to fill out forms supplied by Plaintiff's attorney.

For example, the ALJ concluded that the opinions contained in Dr. Krueger's clinical assessments of pain dated April 29, 2004, and February 14, 2005, were inconsistent with the fact that Plaintiff was working on nearly a full-time basis at the time each opinion was rendered (Tr. 35, 107, 113, 401–02, 467–68, 492–93). "The ALJ's task is to examine the evidence and resolve conflicting reports." *See* Wolfe, 86 F.3d at 1079; *see also* 20 C.F.R. § 404.1571 (work performed during any period under adjudication may demonstrate an ability to perform SGA). In addition, the ALJ properly noted that Dr. Krueger last treated Plaintiff on April 21, 2004, which was almost two years prior to the date of the decision (Tr. 35). Although the ALJ incorrectly stated that Dr. Krueger opined that Plaintiff could sit up to six hours in an eight-hour workday, and therefore his records were "internally inconsistent" because elsewhere he said Plaintiff could sit less (Tr. 35, 464), this error is harmless because the record as a whole supports his determination that Plaintiff could sit

six hours in an eight-hour workday.  *See* Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . ."); *see also* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant); East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination).

For example, as the ALJ noted, Plaintiff underwent a consultative examination by Dr. Koulisis, an orthopaedic surgeon, on January 12, 2005 (Tr. 29).  The findings of Dr. Koulisis are consistent with the ALJ's conclusions.  Dr. Koulisis stated that Plaintiff's range of motion was normal in all areas tested, with the exception of her knee flexion (Tr. 435–37).  Her sensation was intact, and her reflexes were 2+ and equal (Tr. 433).  Plaintiff had no palpable spasm (Tr. 434). X-rays of the cervical and lumbar spine revealed no acute bony abnormalities (*id.*).  Dr. Koulisis concluded that Plaintiff's ability to lift, carry, sit, stand, and walk were not affected by any orthopaedic impairment (Tr. 438–41).  Thus, Dr. Koulisis' objective findings are inconsistent with Dr. Krueger's opinion that Plaintiff was unable to sit for six hours in an eight-hour workday (Tr. 464).  Although Dr. Koulisis was not a treating physician, it is important to note that, unlike Dr. Krueger, he is a specialist in orthopaedics.  *See* 20 C.F.R. § 404.1527(d)(5) (specialization is a factor to consider in weighing medical opinions).

Plaintiff contends that if the ALJ believed that Dr. Krueger's records were ambiguous, he had a duty to re-contact him, citing 20 C.F.R. § 404.1512(e)(1) (Doc. 17 at 15).  However, Section 404.1512(e)(1) notes that a treating physician should be re-contacted if the evidence he provided is "inadequate [to] determine whether [a claimant] is disabled."  Here, the evidence provided by Dr. Krueger was not inadequate; indeed, on the basis of the information he provided, Plaintiff would have been found disabled (per the VE) if his information was fully credited.  Moreover, a minor inconsistency does not trigger a duty to re-contact, especially in the instant case where the ALJ perceived that a conflict existed, but in actuality none existed (the ALJ incorrectly noted that Dr.

Krueger said Plaintiff could sit up to six hours in an eight-hour workday, but elsewhere he said less; the record actually reflects that Dr. Krueger said Plaintiff could sit up to four hours a day in half-hour increments).

Had Plaintiff not been referred for a consultative physical examination, Plaintiff might have a more convincing argument regarding the need to further develop the record.  The seminal cases in this circuit on the ALJ's duty to develop the record are Ford v. Secretary of Health and Human Serv's, 659 F.2d 66 (5th Cir. Unit B Oct. 15, 1981) and Reeves v. Heckler, 734 F.2d 519 (11th Cir. 1984).  Both held that it is not necessary for the ALJ to order a consultative examination unless the record established that such an examination was necessary to enable the ALJ to make a decision. Where he has sufficient information to decide the case, however, he can do so.  Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to a decision, no showing of prejudice is made).  In the instant case Plaintiff was referred to Dr. Koulisis — a specialist in orthopaedic surgery — for a consultative physical examination, and Dr. Koulisis simply reached a different opinion than Dr. Krueger.  The ALJ was not required to re-contact Dr. Krueger, and he properly determined that Dr. Krueger's opinion regarding Plaintiff's ability to sit was not supported by his own treatment records or other medical evidence of record. See Jones v. Dep't of Health & Human Serv's, 941 F.2d 1529, 1532–33 (11th Cir. 1991) (good cause exists where the doctors' opinions were conclusory or inconsistent with their own medical records).

Plaintiff additionally contends that the ALJ erred by giving too much weight to the opinions of the non-examining agency physicians (Doc. 17 at 15).   The ALJ, however, properly acknowledged that the opinions of the State agency physicians were not entitled to controlling weight, but were entitled to some weight (Tr. 35).  He further noted that their opinions were consistent with a finding that Plaintiff was not disabled (id.), see Social Security Ruling (SSR) 96-6p (findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairments(s) must be treated as expert opinion evidence of non-examining sources), and their opinions are also consistent with the opinions of Dr. Koulisis and with the ALJ's ultimate findings.

In conclusion, although the ALJ did not adopt all of the limitations found by Dr. Krueger, the ALJ provided explanations for excluding some of the limitations included in his opinions.  See

Schnorr v. Bowen, 816 F.2d at 581 (reasons for discounting a treating physician's opinion must be provided and must constitute "good cause"); Riley v. Massanari, 139 F. Supp.2d 1293, 1298–99 (M.D. Ala. 2001) (good cause exists to discredit treating physician's opinion where the opinion is not bolstered by the evidence or where the evidence supported a contrary finding). Because the ALJ articulated the reasons on which he relied in discrediting Dr. Krueger's opinions, and because his reasons are supported by substantial evidence on the record as a whole, the ALJ did not err, as "good cause" existed for discrediting the opinions.

As noted *supra*, Plaintiff additionally contends the ALJ erred in determining her RFC, but her argument is based upon the same premise; namely, that the ALJ improperly rejected the opinions of Dr. Krueger. Because the court has concluded that the ALJ did not err in this regard, Plaintiff's argument regarding the RFC determination similarly fails. Similarly, Plaintiff has alleged that the ALJ erred by failing to rely on answers to hypothetical questions posed to the VE which included all of the limitations found by Dr. Krueger (Doc. 17 at 16). A hypothetical question must comprehensively describe a plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported. *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987). Thus, the ALJ was not required to rely on answers to questions that included all of Dr. Krueger's limitations, because he did not find them all to be credible.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Based upon the foregoing, it is **ORDERED** that:

The clerk of court is directed to change the docket to reflect that Michael J. Astrue is substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED** that:

The decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 31st day of January 2008.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**